IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Civil No. 1:19-cv-00018 |
| Plaintiff, ) | |
| ) | |
| v. ) | VERIFIED COMPLAINT FOR |
| ) | FORFEITURE *IN REM* |
| $55,964.00 IN U.S. CURRENCY, ) | |
| ) | |
| Defendant. ) | |
| ) | |

Plaintiff, United States of America hereby files and serves this VERIFIED COMPLAINT IN REM and alleges as follows:

## I.    NATURE OF THE ACTION

1.    This is an action to forfeit and condemn specific property ("Defendant property") to the use and benefit of the United States of America ("Plaintiff") for involvement, as set forth below, in violations of 21 U.S.C. § 846 (attempt and conspiracy), § 841(a)(1)(prohibited acts), and § 843 (Prohibited acts C"), and for violations of 18 U.S.C. § 1960 (Prohibition of unlicensed money transmitting business).

2.    The United States believes the Defendant property is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6), as money or a thing of value furnished or intended to be furnished by a person in exchange for

a controlled substance, in violation of subchapter I – Control and Enforcement, of Chapter 13 – Drug Abuse Prevention and Control, and Title 21 – Food and Drugs, of the United States Code, and proceeds traceable to such an exchange, and money used or intended to be used to facilitate any violation of said subchapter.

3.     The United States believes the Defendant property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1), as personal property involved in a violation of 18 U.S.C. § 1960 or property traceable to such property.

## II.     DEFENDANT *IN REM*

4.     The Defendant property is generally described as $55,964.00 in U.S. currency seized on December 25, 2018 from Brandon Buob (BUOB) in Council Bluffs, Iowa. The Defendant property is in of the custody of the United States.

## III. JURISDICTION AND VENUE

5.     This Court has jurisdiction over this case, pursuant to 28 U.S.C. Section 1345 (United States as plaintiff), as an action commenced by the United States of America, and pursuant to 28 U.S.C. Section 1355(a) (Fine, penalty, or forfeiture), as an action for forfeiture.

2

6.     This Court has *in rem* jurisdiction and venue over the Defendant property under 28 U.S.C. Sections 1355(b) and 1395(b) as the acts or omissions giving rise to the forfeiture occurred in this district and because the Defendant property was seized from and is located in this district.

## IV. FACTS

7.     The "Controlled Substances Act" was enacted by Congress as Title II of the "Comprehensive Drug Abuse Prevention and Control Act of 1970," Pub.L. No. 91-513, 84 Stat. 1236 (1970) (codified at 21 U.S.C. §§ 801-904).

8.     The term "controlled substance" is defined in 21 U.S.C. § 802(6) to mean a drug or other substance, or immediate precursor, included in any of the five schedules of such substances set forth in subchapter I of Title 21.

9.     Schedule I substances have a high potential for abuse, have no currently accepted medical use in treatment in the United States, and there is a lack of accepted safety for use of these controlled substances under medical supervision. 21 U.S.C. § 812(b)(1)(A) - (C).

10. Schedule II substances have a high potential for abuse, the controlled substances have a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions, but use of a Schedule II controlled substance may lead to severe psychological or physical dependence 21 U.S.C. § 812(b)(2)(A) – (C).

11. Schedule III substances have a potential for abuse less than the substances in Schedules I and II, have a currently accepted medical use for treatment in the United States, but abuse of the controlled substances may lead to a moderate or low physical dependence or high psychological dependence. 21 U.S.C. § 812(b)(3)(A) – (C).

12. Schedule IV controlled substances have a low potential for abuse relative to the controlled substances in Scheduled I – III, have a currently accepted medical use in treatment in the United States, but abuse of the controlled substances may lead to limited physical dependence or psychological dependence relative to the controlled substances in Schedule III. 21 U.S.C. § 812(b)(4)(A) – (C).

13. Schedule V controlled substances have a low potential for abuse relative to the substances in the preceding schedules, have a

currently accepted medical use for treatment in the United States, but abuse of the controlled substances may lead to limited physical dependence or psychological dependence relative to the controlled substances in Schedule IV. 21 U.S.C. § 812(b)(5)(A) – (C).

14.    Only persons registered by the Attorney General of the United States, in accordance with rules and regulations promulgated by the Attorney General, may legally manufacture or distribute controlled substances. 21 U.S.C. § 822(a), (b).

15.    Under the Controlled Substances Act, it is unlawful to distribute, dispense, or possess with intent to distribute, a controlled substance, unless authorized by law to do so.  21 U.S.C. § 841(a)(1).

16.    Under the Controlled Substances Act, it is unlawful to conspire with others to violate its prohibitions.  21 U.S.C. § 846.

17.    Under the Controlled Substances Act, it is unlawful for a person to knowingly or intentionally use a communication facility, including the U.S. Mail, to facilitate the commission of an act or acts constituting a felony under subchapters I or II.  21 U.S.C. § 843C(b). Each separate use of the mails is a separate offense.

18.   Under the Controlled Substances Act, all moneys or things of value furnished or intended to be furnished by any person in an illegal exchange for a controlled substance, all proceeds traceable to such an exchange, and all moneys used or intended to be used to facilitate a violation of Subchapter I of the Controlled Substances Act, is subject to forfeiture to the United States and no property right shall exist in such property.

19.   It is illegal, under federal law, to use the U.S. mail to engage in an unlicensed money transmitting business.

20.   It is illegal, under federal law, for a person to knowingly conduct all or part of an unlicensed money transmitting business, which affects interstate commerce, which involves the transportation of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity.

21.   Any person involved in the transmission of the Defendant property as part of money transmitting business was required by law to have been registered with the U.S. Department of the Treasury, Financial Crimes Enforcement Network (FINCEN), when doing so.

22.    The property involved in an illegal, unlicensed money transmitting business is forfeitable under federal law.

23.    It is believed that evidence will show, or will after a reasonable opportunity for further investigation and discovery, that the Defendant property constituted the proceeds of a prohibited controlled substance offense, or was used or intended to be used to facilitate a prohibited controlled substance offense, or was involved in a violation of 18 U.S.C. § 1960.

24.    At approximately 12:30 p.m. on December 25, 2018, a 2007 Chevrolet Silverado pickup truck was involved in a single car accident in Pottawattamie County, Iowa on Interstate 29 near mile marker 49.

25.    The single car accident was serious enough to shatter the glass on the windshield of the 2007 Chevrolet Silverado pickup truck, making it dangerous to drive.

26.    The driver of the Chevrolet Silverado pickup truck did not pull over right away at the scene of the accident, but continued driving until it stopped at a nearby Pilot Truck Stop.

27.    Brandon BUOB was the driver of, and sole occupant of, the Chevrolet Silverado pickup truck.

28.   Shortly after the Chevrolet Silverado pickup truck stopped at the truck stop, law enforcement arrived at the scene to evaluate the situation.

29.   Both of the officers at the scene smelled the strong odor of marijuana emanating from the Chevrolet Silverado pickup truck.

30.   One officer observed loose marijuana in plain sight on the driver's side floor board.

31.   It is illegal under Iowa and Missouri law to drive while impaired by the influence of a controlled substance.

32.   BUOB told law enforcement he could not locate his wallet.

33.   As one of the officers spoke with BUOB, the officer saw a wallet laying on a travel bag in the back of the Chevrolet Silverado pickup truck, and he thought it might contain BUOB's "missing" identification.

34.   When the officer opened a back door of the Chevrolet Silverado pickup truck to help BUOB locate his "missing" identification in the wallet, he observed a vacuum-sealed bag of U.S. Currency.

35.   In order to try and avoid creating business records of their illicit transactions, it is common in the illegal drug trafficking trade for

sellers and purchasers to conduct business in U.S. Currency, rather than using traceable payment means, such as checks or credit cards.

36.   It is a known practice of the illegal drug trafficking trade for drug dealers, and couriers of money derived from the illegal sale of controlled substances, to package drug money in vacuum-sealed bags, in order to try and prevent other people, including, but not limited to, law enforcement officers and drug-detection dogs, from smelling the odor of controlled substances that is often lingering on the "drug money."

37.   A legitimate business-owner has no need to vacuum-seal bundles of U.S. Currency.

38.   A properly-trained, drug-detection dog was deployed thereafter to determine if illegal drugs were in the Chevrolet Silverado pickup truck.

39.   The properly-trained, drug-detection dog alerted to the presence of one or more controlled substances.

40.   After the properly-trained, drug-detection dog alerted to the Chevrolet Silverado pickup truck, the officer conduct a lawful, probable cause search of the Chevrolet Silverado pickup truck.

41.   Inside the Chevrolet Silverado pickup truck, an officer located a substance he suspected was methamphetamine and what appeared to be two pills of Clonazepam.

42.   Methamphetamine is a Schedule II controlled substance and is classified as a Central Nervous System Stimulant.

43.   The physical effects of methamphetamine can include loss of appetite, hyperactivity, dilated pupils, flushed skin, excessive sweating, increased movement, dry mouth and teeth grinding (leading to "meth mouth"), headache, irregular heartbeat (usually as accelerated heartbeat or slowed heartbeat), rapid breathing, high blood pressure, low blood pressure, high body temperature, diarrhea, constipation, blurred vision, dizziness, twitching, numbness, tremors, dry skin, acne, and pale appearance.

44.   The psychological effects of methamphetamine can include euphoria, dysphoria, changes in libido, alertness, apprehension and concentration, decreased sense of fatigue, insomnia or wakefulness, self-confidence, sociability, irritability, restlessness, grandiosity and repetitive and obsessive behaviors. Peculiar to methamphetamine and related stimulants is "punding," or persistent non-goal-directed

repetitive activity. Methamphetamine use also has a high association with anxiety, depression, amphetamine psychosis, suicide, and violent behaviors.

45.    Clonazepam is a Schedule IV controlled substance, and is classified as a benzodiazepine. The drug has a calming effect on the brain and nerves.

46.    During the search, law enforcement also located some U.S. Currency loose on the floor of the Chevrolet Silverado pickup truck.

47.    In an open duffel bag in the back seat of the truck, law enforcement found a vacuum-sealed bag containing U.S. currency.

48.    During the search, law enforcement also observed loose marijuana.

49.    BUOB later agreed to speak with law enforcement, and was voluntarily transported to the Council Bluff Police Department Headquarters.

50.    At the CBPD Headquarters, law enforcement started to read BUOB his rights, when he blurted out "I didn't even know the shit was in there. I take full responsibility for everything I knew was in there . . . In the brown Carhardt bag . . . everything else, no."

11

51.   Thereafter, BUOB was read his rights, signed the advice of rights form, and consented to be interviewed.

52.   BUOB identified his boss as Geoffrey CLAGGETT.

53.   BUOB said he had known CLAGGETT for approximately 15 years.

54.   BUOB said CLAGGETT was aware BUOB was struggling financially, and recently offered him a job driving the Chevrolet Silverado pickup truck from St. Louis, Missouri back to their home state of Washington.

55.   CLAGGETT agreed to pay BUOB by paying the rent on BUOB's residence.

56.   BUOB said he met CLAGGETT in St. Louis, and CLAGGETT had a "fistful of cash ready to make some deals, ready to buy some dirt bikes and trucks."

57.   BUOB had no explanation for why CLAGGETT needed to leave the Seattle metropolitan area, or the Pacific Northwest in general, to purchase "dirt bikes and trucks."

58.   It is approximately 2,087 miles between Seattle, Washington and St. Louis, Missouri.

59.    CLAGGET paid for BUOB's plane ticket to St. Louis, and met BUOB at Lambert International Airport in St. Louis.

60.    BUOB claimed he and CLAGGETT "scoured Craigslist" looking for interesting things, and located the Chevrolet Silverado pickup truck he was driving and a "quad runner."

61.    CLAGGETT directed BUOB to drive the newly-purchased, used Chevrolet Silverado pickup truck back to Seattle from St. Louis.

62.    Unprompted, BUOB said he had no idea what was in CLAGGETT's duffel bag.

63.    Law enforcement had not, at the time, disclosed they found anything suspicious in what BUOB described as CLAGGETT's duffel bag.

64.    BUOB admitted to possessing a small amount of methamphetamine, which he used to stay awake during the road trip.

65.    The license plates on the Chevrolet Silverado pickup truck were fraudulent, but BUOB said he did not know that.

66.    BUOB said CLAGGET only asked him to transport a duffle bag with dirty laundry in it back to Seattle.

13

67.    A law enforcement officer explained to BUOB that it is common for people in financial distress who are lower-level participants in the drug trade to become involved in transporting narcotics and drug money.

68.    When advised of this information, BUOB replied, "Ya, maybe I went and got too big for my belly."

69.    BUOB later said the money didn't smell like "dope."

70.    BUOB had not been told the money smelled like "dope," and his familiarity with how it smelled contradicted his earlier statement that he did not even know the money was in the vehicle.

71.    BUOB denied that CLAGGETT gave him any money for expenses incurred during the trip from St. Louis to Seattle, even for gas.

72.    BUOB said he used his own money, taken from his saving account, to pay for such expenses.

73.    BUOB's claim to have a savings account with sufficient funds to finance the return trip is inconsistent with his earlier assertion to be broke, and needing CLAGGETT to pay his rent.

14

74.   BUOB later claimed that the $1,200 in loose currency in the Chevrolet Silverado pickup truck was for emergencies, new tires, and his bills.

75.   BUOB's claim as to the purpose and source of the $1,200 is inconsistent with his earlier assertion CLAGGETT had not given him any money for expenses.

76.   BUOB filed a form disclaiming the "bag of money," but not the loose currency, which he said was CLAGGETT's.

77.   When BUOB was completing the claim paperwork, he said, "you want me to put my name on a document basically snitching. . . ."

78.   Eventually, BUOB stated, "I want immunity."

79.   On December 26, 2018, law enforcement examined the bundle of suspected currency.

80.   As law enforcement cut the plastic surrounding the suspected currency, they could all smell the strong odor or marijuana.

81.   Inside the vacuum-sealed bundle were two smaller, vacuum-sealed bundles.

82.   One smaller, vacuum-sealed bag contained seven separate, rubber-banded bundles of money, totaling $24,230.

15

83.    The other smaller, vacuum-sealed bag contained three separate, rubber-banded bundles, totaling $30,500.

84.    The total amount of currency in the Chevrolet Silverado pickup truck totaled $55,964.00.

85.    The bundle of currency found loose in the Chevrolet Silverado pickup truck was wrapped in black duct tape.

86.    A roll of the same tape was located in the Chevrolet Silverado pickup truck.

87.    On December 27, 2018, law enforcement spoke via telephone with CLAGGETT.

88.    CLAGGETT contradicted BUOB, and said he learned about the Chevrolet Silverado pickup truck he purchased not from Craigslist, but about a month earlier from a "friend of a friend."

89.    CLAGGETT could not provide the name of the person from whom he purchased the Chevrolet Silverado pickup truck.

90.    The former owner of the Chevrolet Silverado pickup truck later advised law enforcement he knew nothing of CLAGGETT or his interest in the truck until approximately December 23, 2018, not a month beforehand.

16

91.   CLAGGETT told law enforcement he gave BUOB "some of his old laundry" to bring back to the Seattle area.

92.   CLAGGETT denied knowing about anything else in the Chevrolet Silverado pickup truck, other than the laundry.

93.   The phone call was recorded.

94.   On January 7, 2019, CLAGGETT was in Council Bluffs, Iowa, and met with law enforcement.

95.   CLAGGETT consented to a voluntary interview.

96.   The interview was recorded.

97.   CLAGGETT now stated there was money in the Chevrolet Silverado pickup truck when it was involved in the accident, which he allegedly derived from a bank loan and re-selling cars.

98.   CLAGGETT claimed he told BUOB, who had disavowed any knowledge of the money, to place the bundle of money, totaling $45,000, in a lock box in another vehicle of CLAGGETT'S that he left in St. Louis with a mechanic.

99.   CLAGGETT claimed to have instructed BUOB to pay the mechanic from the $45,000, and put the remainder in the lock box.

17

100. CLAGGETT claimed that he accidentally took the key to the lock box with him, and, therefore, BUOB put the money in the bag of CLAGGETT's dirty laundry.

101. CLAGGETT said the money was in a white, hotel plastic laundry bag, which it was not.

102. CLAGGETT's story on January 7, 2019 concerning how the money ended up in the Chevrolet Silverado pickup truck and the backpack is inconsistent with his earlier statements to law enforcement and with BUOB's earlier statements to law enforcement.

103. CLAGGETT told law enforcement that $20,000 was from a loan he received from Red Canoe Credit Union in Federal Way, Washington, which he claimed to have received in cash.

104. CLAGGETT could not explain why the vacuum-sealed currency had the odor of marijuana on it.

105. CLAGGETT claimed a friend, a man named "Vincent," had put him in touch with the former owner of the Chevrolet Silverado pickup truck to potentially buy it.

106. The former owner of the Chevrolet Silverado pickup truck said a man named "Nick Ray," not "Vincent," put CLAGGETT in touch with him as a potential buyer of the truck.

107. According to the State of Washington, CLAGGETT has no reported income/wages since 2015.

108. Drug dealers often live off of income not reported in tax returns and other government wage-related records.

109. The U.S. Drug Enforcement Administration (DEA) commenced a timely administrative forfeiture against the Defendant property.

110. On or about April 17, 2019, CLAGGETT filed a claim contesting the forfeiture.

111. BUOB did not file a claim.

112. Rather than listing his address as Washington State, CLAGGETT listed an address on 8th Street, in Des Moines, Iowa, where he claimed to have lived for the past eight years.

113. In his electronic claim, CLAGGETT claimed the "money seized was my current net operating capital" for a startup business.

114. CLAGGETT claimed in the loan applications to earn $4,858.33 per month for employment income, from a business named "Sound Tradesmen," allegedly started on November 7, 2016.

115. The online records of the Iowa Secretary of States do not list a business entity in Iowa named "Sound Tradesmen."

116. The online records for the Washington Secretary of States list a business entity named "Sound Tradesmen, LLC," with a registered agent as Geoffrey Claggett and principal offices in Des Moines, Iowa. The business information states the business is "any lawful purpose, construction."

117. In the petition CLAGGETT electronically-filed with the DEA, he reported the following as his "valid, good faith, and legally cognizable interest in the assets(s) as an owner or lienholder" –

> I was in the middle of a startup business buying inexpensive used equipment and vehicles from the Midwest and selling them in the Washington for a premium. I sold equipment from my construction company and took loans out against my vehicles in order to start this business and successfully had multiple sales and purchases. The money seized was my current net operating capital. I am providing proof of my startup loans. See attached loan documents.

118.  In the petition CLAGGETT electronically-filed with the DEA, he reported the following as his extenuating circumstances that warrant the return of the currency to avoid extreme hardship -

> A total of 8 pieces of equipment and/or vehicles (full documentation will be made available) have been purchased and or sold during this business venture. The money seized represents my business operating funds, loans and living expenses. Without those funds I have faced extreme hardship in paying back the loans, paying attorneys fees, and expenses to retrieve my property.

119. As proof of the alleged start up loans, CLAGGETT electronically-filed loan applications totaling $4,000, $7,131, $10,331, $15,505, and $14,500, for a total of $51,467, each for "Vehicle Loan – Refinancing."

120. At various times, CLAGGETT has failed to report any currency having been in the Chevrolet Silverado pickup truck, $45,000 (minus repair expenses for a different truck) having been in the Chevrolet Silverado pickup truck, and now $51,467 having been in the Chevrolet Silverado pickup truck.

121. CLAGGETT provided no documentation showing any such loans had been approved, and provided no documentation about what vehicles he wanted to refinance.

122.  Traffickers of illegal drugs and couriers of drug trafficking proceeds often tell different, inconsistent stories about the events related to a potential forfeiture of seized currency, the source(s) of the currency, and even the specific amounts involved.

### V.  COUNT ONE
### (FORFEITURE UNDER 21 U.S.C. § 881(a)(6))

123.  Plaintiff repeats and realleges each and every allegation set forth above.

124.  The United States has reason to believe the Defendant property constitutes moneys or other things of value furnished or intended to be furnished in exchange for a controlled substance, and/or were used or intended to be used to facilitate one or more violations of 21 U.S.C. § 841, § 843, and § 846 et seq.

125.  As a result of the foregoing, the Defendant property is liable to condemnation and to forfeiture to the United States for its use, in accordance with 21 U.S.C. § 881(a)(6).

### VI.  COUNT TWO
### (FORFEITURE UNDER 18 U.S.C. § 981(a)(1)(A) & 1960(b)(1)(B))

126.  Plaintiff repeats and realleges each and every allegation set forth above.

22

127. The United States has reason to believe that on or about December 25, 2018, one or more persons knowingly transported the Defendant property on behalf of a money transmitting business, as that term is defined in 31 U.S.C. § 5330(d)(1) and the regulations promulgated thereunder, including 31 C.F.R. § 103.41 and § 103.11(uu)(5).

128. Title 18 U.S.C. § 1960(b)(1)(B) defines an "unlicensed money transmitting business" as any money transmitting business that 1) affects interstate or foreign commerce in any manner or degree, and 2) fails to comply with the money transmitting business registration requirements under 31 U.S.C. § 5330, or the regulations prescribed thereunder.

129. The money transmitting business referred to herein affected interstate commerce and failed to comply with the money transmitting business registration requirements under 31 U.S.C. § 5330, and the regulations prescribed under such section, as required by 18 U.S.C. § 1960(b)(1)(B). Accordingly, the money transmitting business on whose behalf the Defendant property was being transported was an unlicensed money transmitting business.

130.  Operation of an unlicensed money transmitting business is a violation of 18 U.S.C. § 1960(a), and all property involved in such violation is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

131.  As a result of the foregoing, the Defendant property is liable to condemnation and to forfeiture to the United States for its use, in accordance with 18 U.S.C. § 981(a)(1)(A).

## VII. COUNT THREE
### (FORFEITURE UNDER 18 U.S.C. § 981(a)(1)(A) & 1960(b)(1)(C))

132.  Plaintiff repeats and realleges each and every allegation set forth above.

133.  The United States has reason to believe that on or about December 25, 2018, in the Southern District of Iowa, one or more persons knowingly transported the Defendant property on behalf of an unlicensed money transmitting business, as that term is defined in 18 U.S.C. § 1960(b)(1)(C), knowing the Defendant property was derived from a criminal offense or was intended to be used to promote or support an unlawful activity.

134.  Section 1960(b)(1)(C) defines an unlicensed money transmitting business as any money transmitting business which 1)

24

affects interstate or foreign commerce, and 2) involves the transportation or transmission of funds that the person conducting, controlling, managing, supervising, directing, or owning the business knows (A) to have been derived from a criminal offense or (B) are intended to be used to promote or support an unlawful activity.

135.  For purposes of Section 1960(b)(1)(C), money transmitting is defined to include the conduct described in Section 1960(b)(2).

136.  Operation of an unlicensed money transmitting business is a violation of 18 U.S.C. § 1960(a), and all property involved in such violation is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

137.  As a result of the foregoing, the Defendant property is liable to condemnation and to forfeiture to the United States for its use, in accordance with 18 U.S.C. § 981(a)(1)(A).

## VIII. CONCLUSION

WHEREFORE, the plaintiff requests that the Court issue a warrant and summons for the arrest and seizure of the Defendant property; that notice of this action be given to all persons known or thought to have an interest in or right against the property, that the

Defendant property be forfeited to the United States, and that it be awarded its costs and disbursements in this action, and such other and further relief as the Court deems proper and just under the facts and applicable law.

Respectfully submitted,

Marc Krickbaum
United States Attorney

By: */Craig Peyton Gaumer*
Craig Peyton Gaumer
Assistant United States Attorney
U. S. Courthouse Annex,
Suite 286
110 East Court Avenue
Des Moines, Iowa 50309
Tel: (515) 473-9300
Fax: (515) 473-9292
Email: craig.gaumer@usdoj.gov

## VERIFICATION

I, Matthew R. Kiene, hereby verify and declare under penalty of perjury that I am a Special Agent with the Drug Enforcement Administration, and that I have read the foregoing Verified Complaint *in Rem, United States v. $55,964.00 in U.S. Currency* and know the contents thereof and the matters contained in the Verified Complaint are true to my own knowledge, except for those matters not within my own personal knowledge and as to those matters, I believe them to be true.

The sources of my knowledge and information and the grounds for my belief are the official files and records of the United States and information provided to me by other law enforcement officers, as well as my investigation of this case, together with others, as a special agent with the U.S. Drug Enforcement Administration.

Dated:  July  3 , 2019.

_____
Matthew R. Kiene, Special Agent
U.S. Drug Enforcement Administration

27